Peck, J.
The only question presented, as arising upon the demurrer to the answer of defendant below, is, whether, since the passage of the act of March 14, 1853 (Swan’s Stat. 836), to provide for the , organization, supervision, and maintenance of common schools, “ children of five-eighths white and three-eighths African blood, who are distinctly colored and generally treated and regarded as colored children by the community where they reside,” although in all other respects admissible, are, as of right, entitled to admission into the schools set apart under that act for the instruction of white youth ? The plaintiff in error insists that his children, though in part of African descent, being more than one-half of white blood, are, under the law and the uniform decisions of this court, to be regarded as white, and wero therefore wrongfully excluded by the defendants in error from the common schools of the incorporated village of Logan. Prior to 1848 there was not any legislative provision in Ohio for the education of any but the white youth resident in the various districts. Most of the previous statutes — and they are quite numerous; — merely make’ provision for the instruction of the white youth, and exempt the property of blacks and mulattoes from taxation for school purposes, while some, like the act of February. 10, 1829, in express terms, exclude blacks and mulattoes *from the schools. The act of February 24,1848 *328 (2 Curwen Rev. Stat. 1428), provided, for the first time in Ohio, for the education of colored children, as such, directing the levy of a tax for that purpose upon the property of colored persons, the organization of colored school districts and the appropriation of the tax so levied to the support of separate schools for colored children, if objection was made to their admission into white schools, but prohibited the application of any part of the taxes levied upon the property of the whites, to the support of such colored schools, unless the whites assented thereto. This law, which was very defective and inefficient, was repealed in less than a year after its passage, by the act of February 10, 1849 (2 Curwen Rev. Stab. 1465), which also provided for the organization of colored schools and was complete and effective in its details, but like the law it repealed, appropriated no other funds for the support of the colored schools, save those collected from the property of colored persons.
The law of 1849, continued in force until repealed by the law of March 14,1853, which, conceived in a more liberal and patriotic spirit, not only provides for the education of colored children and imposes the duty or organizing separate schools for them, upon the board of education of the particular locality, but gives to the colored youth their full share, in proportion to numbers, of the common-school fund, and no longer restricts them to the miserable pittance collected from the colored tax-payers ; thus carrying out what Chief Justice Hitchcock, in 19 Ohio, 198, had intimated as the true policy, “ that the white and colored youth should be placed in separate schools, and the school fund should be divided between them in proportion to their numbers.”
This act of 1853, unlike some of the preceding legislation, looks to and makes provision for the education of all the children within the state (section 63) ¡ — children of all races and shades of color. But in so doing, divides them into two classes, “ white ” and “ colored,” and imposes the *duty of providing schools for both classes, though under different teachers, upon the same board of education. The law, then, is one of classification and not of exclusion. All the youth, within the prescribed ages, must fall within the one class or the oth er. All are to bo instructed and to participate equally in the public fund, and the share of one class can never be diverted to the instruction of the other. It is true, that where the number of colored youth is too small to justify the organization or the continuance of a school for colored youth, such school *329 ■must be temporarily delayed or suspended; but this is no more than might occur with the other class under similar cieumstances. In determining what is to be understood by the terms “white” and “ colored,” as used in this act, we may look to the state of things existing at the time, the evils complained of, and the remedies sought to be applied. For nearly two generations, blacks and mulattoes had been a proscribed and degraded race in Ohio. They were debaiTcd from the elective franchise and prohibited from immigration and settlement within our borders, except under severe restrictions. They were also excluded from our common schools and all means of public instruction — incapacitated from serving upon juries, and denied the privilege of testifying in cases where a white person was a party. It would be strange, indeed, if such a state of things had not increased,.in the present goneraation, the natural repugnance of the white race to communion and fellowship with them. Whether consistent with true philanthropy or not, it is nevertheless true, that in many portions, if not throughout the state, there was and still is an almost invincible repragnance to such communion and fellowship. It is also to be borne in mind, that a class had grown up among us, which, though partly black, had still a preponderance of white blood in their veins, and that the courts, influenced in some degree by the severe and somewhat p>enal character of the restrictions as to blacks and mulattoes, had held that such persons were *not only entitled to vote at elections, and testify in our courts of justice, but were also admissible into the schools for white children. It is notorious that these decisions, especially the last, did not receive the hearty approval of the state at large. The prejudice of ages could not be.dissipated by one or more judicial decisions, and the frequent suits brought to enforce such admission, evidence such feeling on the part of young and old.
Under this state of things the act of 1853 was enacted. Three objects seem to have been especially in view. To divide all the youth of the state, for educational pmrposes, in two classes, to provide more effectually for the education of both classes, and to require both classes to be separately instructed. To which of these classes do-the children of the plaintiff in error belong — “white” or “colored?” They are not in the ordinary, if they are in a legal sense, white. The demurrer admits that they are, in fact, if not in law, colored children. Our standard philologist, Webster,, *330 defines “colored people” to be “black people, Africans, or their descendants, mixed or unmixed.” Such is also the common understanding of the term. A person who has any perceptible admixture of African blood, is generally called a colored person. In affixing the epithet “ colored,” we do not ordinarily stop to estimate the precise shade, whether light or dark; though where precision is desired, they are sometimes called “ light-colored,” or “ dark-colored,” as the case may be. If we look at the evils the law was intended to remedy, we shall arrive at the same result. One of the evils undoubtedly was the repugnance felt by many of the white youths and their parents to mingling, socially and on equal terms, with those who had any perceptible admixture of African blood. This feeling or prejudice, if it be one, had been fostered by long years of hostile legislation and social exclusion. The general assembly, legislating for the people as they were, rather than as, perhaps, they ought to have been, while providing for the education and consequent ultimate ^elevation of a long-degraded class, yielded for the time to a deep-seated prejudice, which could not be eradicated suddenly, if at-all. Such an arrangement, in the present state of public feeling, is far better for both parties — for the colored youth as well as those entirely white. If those a shade more white than black were to be forced upon the white youth against their consent, the whole policy of the law would be defeated. The prejudice and antagonism of the whites would be aroused, bickerings and contentions become the order of the day, and the moral and mental improvement of both classes retarded. It would seem then, from this examination of the law of 1853, and the circumstances under which it was passed, that the 'words 'white ” and “ colored,” as used in that act, were both used in their ordinary and common acceptation, and that any other construction would do violence to the legislative intent, and perpetuate the very evils that act was intended to remedy. Such was also the construction which the act, upon its passage, received in many portions, if not throughout the state. The colored population, whether more or less than mulatto, affiliated with the blacks. Schools wore orgai ized, and a wholesome rivalry inaugurated between the two classes.
But it is claimed that the word “ white,” before it was used in the act of 1853, had, by a series of decisions of this court, been held to include all persons, though in part of African descent, who *331 are more than half white, and that the legislature must be presumed to have used it in that enlarged sense. The decisions referred to are Polly Gray v. The State, 4 Ohio, 353; Williams v. School Directors, etc., Wright, 579; Lane v. Baker et al., 12 Ohio, 237; Jeffries v. Ankeny et al., 11 Ohio, 372; and Thacker v. Hawk, Ib. 376.
The case of Polly Gray arose under the law in force at the time, prohibiting blacks and mulattoes from testifying in cases whore a white person was a party. The eases in Wright, and in 12 Ohio, were cases arising imder the school *laws in force prior to 1843, and the two cases in 11 Ohio are cases where persons of more than half white blood had been debarred from voting at elections. The opinions are very brief, and in none, save the first two, do the court assign any reason for the opinion, except the authority of the decision in the Polly Gray case. The statutes and the constitutional provisions as to voters, under which the questions arose, are disabling and exclusive in character, and it is apparent, from what is said, that the tendency and effect of the provisions greatly influenced the decisions. In the case of Polly Gray the court remark, that the statute defines only three classes of persons, whites and blacks and mulattoes, and say that they arc not willing to make a third class, nor define the degree of darkness that should exclude. And in the Williams case they speak of the “ shabby meanness ” of taxing them for the support of common schools, and excluding their children from the benefits; and also say that color-is very unreliable, and that it is blood and not color that incapacitates. It is obvious that if the statutes in those cases had excluded colored persons or children, as well as blacks and mulattoes, a different result would have been attained. As between whites and blacks- and mulattoes, they might well limit the disability to the mulatto; but if colored had been used, then all less than white would have been excluded. There' is no margin between white' and colored ; and all that are not white are colored; and in such case, the court would have been required to do what they, in the Williams case, refused — to consider color as well as blood. Not complexion alone, but complexion and blood combined. The test of exclusion would have been — is the applicant of mixed blood, and is that admixture apparent? If the word “white,” in the law of 1853, was used in the same connection as in the laws under which those decisions were-made, it would be fair to presume that the legislature intended it. *332 to bear the same relative signification; but where they drop the words “blacks and mulattoes,” and Aplace, in opposition to white, a term which embraces all less than pure white, no such presumption can fairly or properly arise. That the legislature intended that the word “ colored,” in the law of 1853, should bear its ■ordinary and popular signification, is also apparent from the fact that in section 5, of the law of 1849, they qualified and restricted its signification for the purposes of that act; but in the law of 1853, which repealed the law of 1849, and relates to colored youth, they did not re-enact the restriction, though the necessity still existed, if the limitation was intended to apply thereafter.
These decisions in regard to the right of persons more than half white to testify, and to attend the common schools, have had their ;-day, and accomplished their purpose, and we do not seek to disturb them. The statutes to which they apply, have been repealed, and the construction we place upon the act of 1853 does not conflict with them. It is a law of classification, and not of exclusion, intended and designed to place in one school all the white youth, and in the other, all who have any visible taint of African blood. That the legislature have the power thus to classify tho scholars, even when all are undeniably white, no one will question. It might, perhaps, have been better if some further and more definite provision had been made for the education of colored youth, in districts in which the number is so very limited, as it appears to be in the ■village of Logan. That, however, is a matter for the consideration of the legislature, and not for tho judiciary.
We do not undertake to decide whether the decisions as to the right to vote under the old constitution, above referred to, applyto ■similar cases arising under the new. It will be time enough to determine their applicability to the new constitution, when the ■question is before us. There is no necessary connection between the two questions; nor is there such an incongruity in excluding light mulattoes. from the white schools, and permitting *them to participate in elections, as the counsel for the plaintiff seem to suppose. If the law excluded them altogether from the means of •education, it might be somewhat incongruous to permit them to participate in tho elections; but when their education is enjoined «.nd the means provided, though in separate schools, no such incongruity can arise.
A majority of the court then held that colored youth of the *333 description stated in the answer of the defendants, are not, as of right, entitled to admission into the schools, organized and set apart under the act of March 14, 1853, for the instruction of white-youth.

Judgment affirmed.

Scott and Gholson, JJ., concurred.
Brinkerhofe, O. J., and Sutliee, J., dissented.
Sutliff, J.
I am unable to concur in the judicial construction, given in this case, by my brethren, to the words “ colored children,” as used in the statute under consideration.
There are, in my opinion, several reasons, each of which seems strong against their holding in the case before us.
In the first place, I remark, that caste legislation, the inveterate-vice of absolute governments, is inconsistent with the theory and spirit of a free and popular government like ours ; asserting in its-bill of rights the equality of all men. A free government like ours must be presumed, so far as practicable, to avoid class legislation ; and rather to trust and favor the natural liberty and right of individuals to form and regulate their own social circles and classification according to their respective predilections and prejudices.
In the second place, it is quite obvious, if it should be deemed proper and consistent legislation for a free state to organize the people into classes, that it is impracticable to any considerable extent, without encountering inextricable ^difficulties. This difficulty will be encountered, whether the basis of the classification be-a difference in races, religion, language, color, or any physiological peculiarities. A strict construction against all unnecessary extent of such legislation should, therefore, be preserved.
It is sufficient to barely suggest these considerations, as they have doubtless had their influence upon the legislation and adjudication upon this subject, which have heretofore obtained in this state.
The main reason, however, and the one I rest my dissent principally upon, is the former construction given, and as I think well established, to the little of class legislation which has obtained in this state.
The wisdom and beneficence of the law under consideration is not in this case called in question; the line of demarcation between the two classes is.
*334 INor is the popular or philological meaning of the word “ colored” now under consideration; but the legal construction of the words “colored” and “white" is necessarily involved in the case, and •submitted for our adjudication.
How then stands the law upon this single question?
On the 7th of March, 1848, the legislature of this state passed the first law for the establishment of separate schools for colored • children. That law is entitled “ An act to provide for the establishment .of common schools for the education of black and mulatto persons, and to amend the act entitled 1 an act for the support and better regulation of common schools, and to create permanently the office •of superintendent,’ passed March 7, 1838, and the act amendatory thereto, passed February 4, 1848.”
It is provided in that act as follows: “Sec. 1. That all such property belonging to black or colored persons, as is liable to taxation, when owned by white persons, be taxed for school purposes, and the taxes thereon assessed, be collected in the same manner as similar taxes are by the act to which this is an amendment, a separate account of which shall, be kept by the several county auditors, and *shall be paid out for the support of schools for black or colored persons in any district in which such schools may be organized ; but in any such district in which the children of black or colored persons are permitted to attend the common schools with the children of white persons, then such fund shall be added to the common-school fund of the district from which it was collected, and paid over to the treasurer of said district on the order -of the directors of said district.” 2 Curwen’s Stat. 1428. In like manner in each of the ten sections of this act (of March 7, 1848), the words “ black or coloi'ed persons,” “ black or colored children,” and “black or colored tax-payers,” are used as synonymous, and contradistinguished from white persons, white children, and white tax-payers. And this use of the words “ black or colored,” in the . act, in connection with the words “ black and mulatto persons,” used in the title of the act, and the established interpretation at the time, of the words “ black and mulatto,” would all go clearty to show that the legislature, in that act, used the word “ colored ”.as sjmonymous with “black and mulatto.”
But, as if to prevent the possibility of a doubt upon the subject, the legislature, by the act of February, 1849, revising the act of 1848, clearly expressed what they had in the preceding act so *335 plainly indicated. It is provided in the act of 1849 as follows: Section 5. “ The term colored, as used in this act, shall be construed as being of the same signification as the term ‘ black or mulatto,’ as used in former acts.” 2 Ourwen’s Stat. 1466.
I deem it important to refer to these prior acts, and especially to the act of Februarj1- 10, 1849, for the purpose of better understanding the true construction of the statute of March 7, 1853, now under consideration. I take it for granted that the word “colored,” as used in the act of March, 1853, must retain the-same construction as under the act of February, 1849, unless the legislature have clearly expressed in the latter statute an intention to ^change the construction. For it is a well-settled rule that in the revision of statutes, neither an alteration in phraseology, nor the omission or addition of words in .the latter statute shall be' held necessarily to alter the construction of the former act. And the court is only warranted in holding the construction of a statute, when revised, to be changed, when the intent of the legislature to make such change is clear, or the language used in the new act plainly requires such change of construction. And such, indeed, has been the holding of this court at the present term, in the case of Ash v. Ash and others. See also to the same effect the cases of Taylor v. Delancy, 2 Caine’s Cases, 143; Gaffey v. Colvill, 6 Hill, 574, and other authorities.
What, then, was the meaning of the words “colored children” .and “ colored persons,” in the act of 1849 ? The answer is given, as we have already seen, by section 5 of that act, which provides that the term “colored,” as used.in that act, shall have the same ■signification as “ black and mulatto,” used in former acts.
We have, then, only to ascertain what was the then well understood and accepted signification of “black and mulatto,” to have the definite and certain meaning and signification of the word “ colored,”-as used in the act of 1849, and consequently in the act of 1853, now before us for construction.
As early as January, 1804, the legislature passed an act subjecting black and mulatto persons to certain disabilities in this state. See 1 Chase’s Stat. 393. And on the 27th of Januai’y, 1805, by way of amendment, the legislature provided, among other things, by section 4, “ that no black or mulatto person or persons shall hereafter be permitted to be sworn or give evidence in any court of record or elsewhere, in this state, in any case depending, or *336 matter of controversy, where either party to the same is a white person, or in any prosecution which *shall be instituted in behalf of the state against any white person.” 1 Chase’s Stat. 556.
This section came first under the consideration of the court in bank of this state, in the case of Polly Gray v. The State of Ohio, 4 Ohio, 353. The question made in that case was, whether a person “ of a shade of color between the mulatto and white,” was to be regarded as a “white person.” within the meaning of that statute; and the question was resolved affirmatively. The court say, in that case: “ The statute is one which a court is called upon to execute with reluctance, yet, when a case is presented, the court has no alternative but to yield' to the expression of the legislative will. Three descriptions of persons are designated by name in the statute— white, black, and mulatto; and these three are well known by the-same terms in common life: but we doubt whether wo can refine upon these obvious distinctions, or whether good policy or good sense-requires us to raise the necessity for further discrimination. We are unable to sot out any other plain and obvious line. Color alone is* insufficient.” . . . “ We are of opinion that a party of such blood is entitled to the privileges of whites; partly because we are unwilling to extend the disabilities of the statute further than its letter requires, and partly from the difficulty of defining and ascertaining the degree of duskiness which renders a person liable to such disabilities.” Thus the court, in this, their first judicial construction of the words “ white person,” as contradistinguished from “ black or mulatto” persons, refused to extend the meaning of “black or mulatto” (which they properly term the disabilities of the statutes) further than its letter requires.
The word “black” is well understood to mean the negro; and the word “mulatto” is equally well understood to denote the offspring of a white person and a negro, and as not expressive of any other class of persons. The letter of the statute confines the meaning of the words “black and mulatto” to these two classes; and the *court thus refused, more than a quarter of a century, ago, to extend the meaning of these words of caste beyond the letter of the law. And under the distinction of classes so expressed by the statute, the court expressly includes the “ shade of color between the mulatto and white ” in the general class of white persons.
I propose next to show that this judicial construction, thus early given by the Supreme Court of this state to the word “white,” as *337 contradistinguished from “black” and “mulatto,” has never before been departed from, but has been heretofore again and again affirmed.
The act of March 10, 1831, to provide for the support and better regulation of common schools, provided, by section 1, that a fund should thereafter be raised in the several counties of the state, in the manner pointed out in the act, for the use of the common schools, for the instruction of the white youth of every class and grade, without distinction. Section 34 of the act provided, “that when any appropriation shall be made by the directors of any school district for the payment of a teacher, the school in such district shall be open to all the white.children residing therein.” 3 Chase’s Stat. 1867.
The case of Williams v. Directors of School District No. 6, etc., in Hamilton county (Wright, 578), arose under this act. The plaintiff declared, in this case against the defendants, that he was and had been, for the last five years, a citizen and resident householder and tax-payer of the district, and that he had five children over five years old, which he sent to the school, and who were excluded and denied admittance. Plea, not guilty. The record showed the defense relied on to be, that the plaintiff, their father, was one-quarter negro, and their mother, his wife, a white woman. In delivering the opinion of the court, Judge.Lane used the following language: “ This court, in Gray v. Ohio, determined that persons nearer white than a mulatto, or half-blood, were entitled to the privileges of whites. The color of the party does *not sufficiently mark the distinction between the two races of people.” . . . “We think the term white, as used in the law, describes blood and not complexion, and are satisfied with the construction heretofore given. The plaintiff’s children, therefore, are white, within the meaning of the law, though the defendants have had the shabby meanness to ask from him his contribution of tax, and exclude his children from the benefit of the schools he helped to support.”
Again, in the case of Jeffries v. Ankeny and others, 11 Ohio, 372, at the December term, 1842, the same question came before the Supreme Court of this state. The plaintiff brought suit against the defendants as trustees, for refusing his vote. The defendants refused to receive the vote of the plaintiff, who was a quarter Indian, being of opinion that he was a person of color, and not a “ white male inhabitant” within the meaning of the constitution of the state. Art, 4, sec. 1. The chief justice in delivering the opinion *338 •of the court says: “We regard this matter as clearly settled by the interpretation which the expression in the constitution has received by this court on the circuit, and in bank. In 1831, in the ease of Polly Gray v. The State of Ohio, and in 1833, in the case of Williams v. School Directors, it was held that in the constitution, and the laws upon this subject, there were enumerated three descriptions of'persons, whites, blacks, and mulattoes; upon the two last of whom disabilities rested; that the mulatto was the middle term between the extremes, or the offsprings of a white or black ; that all nearer white than black, or of the grade between the mulattoes and whites, were entitled to enjoy every political and 'social privilege of the white citizen; that no other rule could be adopted so intelligible as this; and that further refinements would lead to inconvenience, and to no good result.”
At the same term of the court, in the case of Chalmers v. Stewart, 11 Ohio, 386, the same construction of *the word “ white ” was reaffirmed. Judge Wood, in delivering the opinion of the court in the case, uses the following language: “Who white children are, has in principle been determined by this court at the present term. Thacker v. Hawk et al. The majority, or predominance of blood, either black or white, carries with it conclusive evidence of the qualifications or disqualifications conferred or imposed by our statutes.”
At the next term of the court (December term, 1843), the same •question was yet again before the judges for their reconsideration, in the case of Lane v. Baker and others, 12 Ohio, 237. The plaintiff brought his action against the defendants as school directors, for •excluding his children from a common school. The defense relied upon was that the children, so excluded, were of negro and Indian -blood, though more than half white. The question arose under the .act for the support and better regulation of schools, etc., passed March . 7, 1838. But the provisions of that act did not differ substantially from that of the preceding acts in regard to the distinction made in favor of “ white ” children. The 1st section of the act provided that a fund should thereafter be provided as specified in the act “for the education of all the white youth in the state in certain branches •of learning.” The 2d section provided for levying a tax upon the .taxable property in each county Q‘the property of the black and mulatto persons excepted”), to constitute a fund for such common schools. The court say the case depends upon the same principles with that of Jeffries v Ankeny et al., and affirmed their previous decisions by *339 giving judgment for the plaintiff. And although in two of the preceding cases, to wit, Jeffries v. Ankeny et al., and Thacker v. Hawk et al., Judge Head dissented, he seems to have acquiesced in this last case of Lane v. Baker et al.
The courts, I believe, have uniformly adhered to the rule expressed in Gray v. The State, in relation to the disabling statutes toward “ black ” or “ mulatto ” persons. *Thus is the case of Jordan v. Smith, 14 Ohio, 199, the plaintiff, a white person, had brought a suit against a negro, and to sustain his cause of action, introduced the evidence of a black, which was objected to by the defendant’s counsel. Judge Hitchcock, in delivering the opinion of the court, thus remarks upon the disabling statute of 1807: “ The law says ‘ no black or mulatto person or persons shall be permitted to be sworn or give evidence ’ where either party is a white person. 1 Chase, 556. But it is said this statute confers upon a white man a personal privilege. He maj1- at his election permit or refuse the evidence of a black witness, and that this black opponent has no right to object to a witness of his own color. Such is not the law. By positive statutes, the black man is an incompetent witness; and I have yet to hear that one party to a suit has any better right than the other to object to a witness on the ground of his competency,” thus adhering to a strict construction of those disabling statutes.
In the case of Steward v. Southard, 17 Ohio, 402, Judge Birchard, in delivering the opinion of the court at the December term, 1848, took occasion to refer incidentally to the previous decisions of the court upon this subject, with an expression of approbation. He says of the case of Lane v. Baker, “ the only thing decided in that case was that youth of more than half white blood are entitled to the benefit of the common-school fund,” and that he concurred in that decision.
Other cases might probably be referred to, showing, in like manner, that from the time of the first statute enacted in this state (January 5, 1804), in relation to “black and mulatto persons,” down to the present time, the Supreme Court has uniformly maintained, and steadily adhered to, the same judicial construction of the word 11 white ” as contradistinguished from “ black and mulatto,” or colored persons.
And this holding of our courts I regard as strictly in *accordance with the general rule applicable to such statutes. Statutes *340 which are in restraint of natural liberty, or which derogate in any other manner from the general law, and laws which have an ap- , parent hardship in them, are to be interpreted in such a manner as-not to extend beyond what is clearly expressed in the law to any consequences to which the law does not necessarily extend.
In the passage of the act of February 10, 1849, the legislature,, as well as in the preceding act of March 7,1848, evidently intended to express their approval and acceptance of the long and uniform judicial construction given in this state to the laws descriminating between “black or mulatto" persons on the one hand, and white persons upon the other. Hence, in the introduction of the word “colored ” in that act, for brevity, in the place of the words “black or mulatto,” as used in former acts, it is especially provided by .section 5 that the term “colored" as used in the act, shall be regarded of the same signification as the term “ black or mulatto." And the act of 1853, now under consideration, uses the words-“colored children” in the same sense as used in the law of 1849. This is evident from the language of the act.
It may also, in this connection, be remarked that the constitutional convention of 1850, well knowing the construction so given the word “ white” in the old constitution, and the legislation under it, accepted and approved that construction by inserting the same-word “white” citizen in the new constitution. See art. 5, sec. 1. See also the debates in the constitutional convention ujoon this subject.
Nor can I perceive how the fact of the construction thus given to-the words “colored” and “ white,” failing to conform in all cases to the line of caste as actually existing, constitutes any necessity for now changing such long-established construction.
An amendment of the school law by a provision allowing any of either class, upon permission first obtained and *on due notice given, to be taxed with and attend the schools of the other class, would obviate such objection. The line of caste would thus become to some extent self-adjusting, to meet the actual social classification of the youth, as existing in fact in every district. But it seems to me alike unwise and whollj’ out of character with the progress, the general intelligence, and liberality of the age at this time — more than ten years after the repeal of tho “black laws,” so called, and more than half a century after a liberal and humane interpretation of those disabling statutes has been inaugu *341 rated, and constantly ever since then maintained — to overrule all the decisions of the many able and wise judges who have preceded us, and to give an extent and effect to those disabling statutes, which this court has always heretofore, time and again, refused to •do. For these reasons I utterly dissent from the opinion expressed -by my brethren in -this case.